Can I have the attorneys who are planning to present before us to approach the podium identify yourselves please. On behalf of Pamela Harnack. Good morning your honor, my name is James Dahl, I represent We'll start off with the appellant and we'll have 15 minutes of argument and I would suggest that as to Harnack we have 15 minutes and Mr. Dahl if you'd like 15 minutes and then you can certainly reserve some time for rebuttal if you wish upon. Okay, let's proceed. Whenever you're ready. Your honor. No problem, take your time. And please support Janella Barbro for respondent appellant Steve Fanady and I do apologize for my voice I have had a bronchitis and laryngitis so today I'm struggling to speak but I do apologize. This matter arises from a divorce case in which after respondent Fanady was defaulted a judgment of dissolution was entered which erroneously overstated the marital assets in this case because it included in the marital assets all of the property held by any business in which the respondent had an interest without regard to the interest of his partners in that property. Don't you think it would have been helpful to the trial court to keep the trial court from overstating the assets if maybe your client would have participated? It certainly would have been beneficial. So what is his excuse for not participating in the proceedings? What's stated in the record is that at the pretrial conference he was told by the pretrial judge that there would not be a trial on the merits and that he should just write his ex-wife a seven-figure check. As a result of this he lost faith in the justice system and decided to stop participating. He got scared by Judge Hyman, did he? I don't know if he was scared but certainly he felt that at this point there was no sense to participate since that was going to be the eventual outcome. Somehow at some point didn't another judge become involved? Other judges later on became involved in the case. At this point Mr. Fantasy was not participating in the divorce proceedings. Does the record show when the four seats were acquired? Does it show the time frame? I do not believe it's specified in the record exactly. First of all I believe there are only three seats involved. There are three seats that are involved in the judgment but there's references throughout the record about another seat that was held by the corporation if I'm not mistaken. Anyway to make a long story short, let's go to the three. I do not believe that there is an indication in the record exactly when those seats were acquired. Well doesn't the record show that he began working at the Board of Trade after he was married? The record does not specify that, Your Honor. It doesn't say when he became working at the Board of Trade. But I believe the fourth seat that you're referring to... No, I'm off that. Now we're at the three. Just those. Forget the fourth. That was sold, wasn't it, to a corporation in Switzerland? It was actually sold before and it was used as a proceeds to purchase the house. So the three seats. Now, just the three seats. Any information in the record as to when they were acquired? I do not believe that it specifies in the record when they were acquired other than as far as the seats. The record does specify when the denuclearization happened and the seats were converted to shares. As far as the seats themselves, I don't believe the record specifies exactly when that occurred. Does the record also show when one of these corporations entered into agreements with two other corporations for the joint ownership of the seats? I'm not sure which corporation you're referring to. Well, I'm talking about Mr. Israeloff and Michelle Marm. I'm not sure how you pronounce her name. Doesn't the record indicate that at some point one of Mr. Fanady's... Is that how you pronounce his name? Fanady, yes. One of his corporations was in a partnership with two other corporations involving the ownership of these seats? Yes. Mr. Israeloff actually does make allegations as far as to when those events proceeded. Okay, and then isn't there another person whose company was involved in a purchase of a seat jointly with a corporation that is owned by Mr. Fanady? Of the three seats, I believe what's shown is that one seat is held... There's two seats held by Alpha, but contrary to what was presented to the court in the trial level, Alpha did not own total interest in both seats. Right. One seat was held by Alpha in partnership with each friend. And wasn't that all... Is there some indication in the record that that all occurred post the marriage? I don't know exactly when those dates occurred, Your Honor. Okay. Well, let's get back to that horrifying experience in front of Judge Hyman. Yes. Are you saying that this appellate court should issue a decision that says... By the way, Hyman was a mediator, wasn't he? He wasn't the assigned judge. He was assigned to a pre-trial purpose. For a pre-trial, right? Yes. And Mr. Fanady was represented by counsel at that time, is that right? He was represented by counsel who withdrew right after the pre-trial conference. All right. So are you saying you want the appellate court to issue a ruling that says that if you don't like... If you're a litigant and you don't like the outcome of a pre-trial conference, that you can just stop participating? No. And then if you don't like the way things turn out, you can just get a do-over? No. Is that what you want the appellate court to say? That's certainly not what I'm suggesting here. And I'm not going to suggest that it was a good idea to stop participating in the divorce action. Obviously, that was something that the court cannot condone. And I understand. I certainly understand that. Well, if we can't condone it, how are we supposed to get around it? Because in this particular case, the resulting default judgment was so erroneous. Well, who's fault is that? Well, I can understand why the court may feel that it's in part Fanady's fault, but at the same time, when you step up before the court to present proof on a default judgment, you must actually take all efforts to make sure that the information you present to the court is completely accurate. And in this case, the information presented to the court as to what was marital assets was totally inaccurate. There's an assertion that there were 320. Here we've got, you just told us that the record is devoid of any information regarding the acquisition of those seats and when they occurred. Now, do you agree with the general principle that assets acquired after the marriage are presumed to be marital assets? We have that general principle. Do we not? But I'm not arguing about that general principle. Wait, wait, wait, wait. So we have a record now that you're saying is devoid of information about when the acquisition of those assets occurred. But when we review a judgment of the court, it is the burden of the appellant to show us and establish the errors. And now you're telling us that you have no information as to when those assets were acquired and the record doesn't show that. Therefore, we presume that the trial court acted in accordance with the law and that those assets were acquired after the marriage and they are therefore presumed to be marital assets. Now, how does the appellant respond to that? Because the assets that we're talking about, they're assets that were declared marital property that Sandy did not own and part of the assets that he held in partnership with others were declared marital property. But you have to establish that. That's the burden of the appellant to show how the court erred because you've shown that these weren't marital assets. But actually, you haven't shown that in the briefs or the record on appeal now. And that was your burden to show us that those were not marital assets. And you have to do that with proof, not by mere suggestions or conclusions. The Israel Off Action alone attaches the partnership agreement and establishes that there are 40,000 shares that he is entitled to. The Mar-May Partnership Agreement is in the record. Right, and those are all post-marriage. They're all down the road post-marriage and they show that since they were acquired post, they are presumed to be marital property. Now, the court's already set aside a portion in escrow for Israel Off. But the matter is not whether they were acquired for your post-marriage, even if they're acquired post-marriage. No, it's whether or not they were marital assets. Right, and if Andy himself did not have ownership interest in 100% of those shares, then even if they're acquired during the term of his marriage, they are not marital assets. Well, aren't you making that argument, aren't you asserting the rights of others? Aren't you asserting Israel Off's rights or some other partner's rights? Why do you have standing to complain that the court assigned somebody else's asset to the FLE? Where's your standing to that? Because the resulting decision impacts us, impacts the sanity as well as its partners, because by overstating the marital assets when the court then divides it, it ends up with a very unequal distribution and there's no indication in the record that the trial court was attempting to give 87% of the assets to the wife, in addition to the house and maintenance and other things. We do have just a four-and-a-half year marriage here with no children. Let's put this in the context of the procedural vehicles you're relying on. You're relying on 2-1301 and 2-1401, is that right? Yes. Why don't you talk to us about how you have satisfied the requirements of either of those vehicles? I believe that actually the appropriate standard here was under 2-1301 because I do not believe that the judgment of dissolution that was entered was a final judgment. It did not resolve all of the issues. Why did he get married then? Isn't he a bigamist then? If you're telling us that that divorce judgment was not final, aren't you confessing to the court today that your client is a bigamist? Should we call the sheriff? No, I don't believe that if there's not a resolution as to all of the issues, that that makes the whole judgment invalid as to the declaration that they are actually divorced. Doesn't there have to be a bifurcation order in order for that to happen? In order for someone to be involved in a dissolution of marriage, to get married again before the case is resolved, don't you need a bifurcation order? I am not aware of a bifurcation order or none on that, Your Honor. But I do not believe that where they set aside a judgment that it sets aside $40,000 versus shares, which are supposed to be worth more than a million dollars, and says we're going to hold those in escrow, is a final judgment. And also, under 1301, let's assume, just for a brief moment, that it is final. Okay, let's assume that. The statute says the court may. And this wasn't simply a default and a failure to appear. This went to a default judgment. Yes, I understand it. Seven months later? The default was... Was it seven or nine months later when he came in? Yes. So, assuming that it was a final order, the court is not required to vacate the default judgment and it can consider all the circumstances surrounding that judgment in making its decision, correct? Yes, Your Honor. And what's the standard of review for us to look at what the trial court did when it denied? In this case, you do argue that the court was under the erroneous impression that 1301... 1301 did not apply. Did not apply. And therefore, since he erred in that respect, I think you suggest we review it de novo? No, it's an abuse of discretion standard. So, when the court errs in its understanding of what it's supposed to do, do you believe it's an abuse of discretion? When the court applies the wrong standard, I believe it's an abuse. If it fails to exercise discretion because it erroneously believes that it does not have discretion, I believe that is an abuse of discretion. And we don't know what the trial court would have done because the court did not exercise its discretion in this manner to try to attempt to resolve the equities in this case. It's possible that the court would have granted if it believed that it could and had the discretion under 213.01. But it's pretty clear in the opinion what had been argued that 213.01 only applies if it would have been brought within 30 days of the judgment. And so the court accepted that contention and then said then we have to look at 214.01 and found no due diligence in presenting the matter under 214.01. Let me ask you something about your 1301 argument. Yes. A court in determining that takes into consideration whether the movement acted in a reasonable manner. Wouldn't that be true? One of the factors that it can consider, but it's not the only factor. And can the court also consider his entire conduct throughout this trial? There isn't any case that it can consider his entire conduct. And then another thing the court is going to look at is whether the terms of the dissolution is fair. Right. I think it's so grossly unfair. Tell us how. How it's so grossly unfair. That's what I'd like to hear. Because the vast majority of the assets were all awarded to the white and the court did not realize when it was doing that that it was awarding almost 90% of the assets, 85% of the assets to the white. There's no indication in the record that that's what it intended to do. As far as whether it was done to punish him, the court actually did award $200,000 in attorney fees against him as a punishment for certain things that had happened in the trial court. But there is no indication that it was. Has he ever been paid? Pardon? Has he ever been paid? I do not know if that has been paid. I believe. That's another question. The court has ordered maintenance. Has any maintenance of any type ever been paid in this case? The record doesn't reflect. It reflects that the maintenance payments have never been made, doesn't it? It reflects as of the time of the judgment the maintenance payments were not made. I do not believe there's any indication since then whether the maintenance payments were made. How can you come to court and ask for equity with a straight face, with facts like this, not paying maintenance, walking out on the judicial proceedings, driving across the neighbor's lawn to evade a processor, walking out of the courtroom on the day of the proof of it? How can you come into the court and ask for equity? Don't you have to have clean hands? Actually, I don't believe the clean hands applies in this particular instance. It's a concept that comes from contract law, and we're not dealing with it. The 1401 is clearly the way you've argued, calling on the court for equity. You've suggested, and you've cited some cases that suggest that we don't look at the three factors. However, there's significant case law that suggests we do. You've banked your whole argument under 1401 on doing substantial justice between the parties. You haven't argued there was diligence in filing the petition. You haven't argued that there's a meritorious defense, and you haven't argued that the appellant was diligent in trying to preserve the meritorious defense  You haven't argued that at all. I believe the meritorious defense here is that... But you didn't argue in your brief. It's weight. You did not argue those elements in your brief. You cannot do that now because you didn't present it in the brief. You rely solely on the cases that suggest that the courts have relaxed the requirements of 1401. I did. I did, Your Honor. I think it's appropriate now to tell us, without it being in the brief, that there's some meritorious defense, that he acted diligently, and that he was diligent in getting into court to present his case. I think I've misled Your Honor. I'm now trying to argue that because I did not argue it in the brief. But it does pertain to the doing justice here, even though... Well, Justice Conrad didn't mention the other things that the court had knowledge of, that there was a forgery of a divorce decision by a judge of the domestic relations division, Judge Katz. He didn't mention that the appellant went down to Florida and procured another divorce decree while this case was pending. Now, these are things that the court had... They represented to the Florida court that he didn't know where his wife was when she was in the midst of a divorce case here. I am aware of this. What the record shows, as far as the forgery, there's no... The allegation was made there was no proof offered. And that issue, as you said, has been contended in the brief. These are briefs and matters that are outside of the record and certainly things that happened after this appeal was filed. But what was the judgment, the divorce judgment, procured in Florida, outside the record? No, that is in the record. Was the fact that the court ordered maintenance to be paid and that at the time of the judgment, all of those court orders had been ignored? Does the record show that? You just told us a few moments ago. Yes, it shows that it had not been paid as the judgment itself declares, that the prior order had not been followed and that the maintenance had not been paid. And what does the court do, the trial court, sitting, acting as the trial judge, when faced with a recalcitrant party who is simply ignoring those orders? You don't think that that has anything, any impact on the decision-making process under a 1401 or even 1301? I think that's why the court attempted to order... It looks like the court was attempting to order 50% of the property, but I don't think that the court intended to order 85% of the property. Well, how was the court intending to do the 50%? Because what was represented was that there were 320,000 shares of which at least 280,000, and the judgment of dissolution says at least 280,000 were owned by Vanity and sold by him. And the court then awarded her 140,000 shares, which is roughly half that amount. Well, why couldn't this have been brought up in the trial court? Or was it? At the time, because he was not participating at that time. So the judge made a mistake. And the judge made a mistake, and there was no one there to correct him. The judge made a mistake, but the judge made a mistake because this was the evidence that was offered to the judge. There was no one there to correct that. There was no one there to cross-examine. There was no one there to present any evidence to counter that. He just walked away from it, and now you want a do-over. And so all that time is wasted. All those court proceedings are wasted. The time spent drafting the judgment for dissolution is wasted. We should just allow people to just sit out and wait and see how it turns out, and then if you don't like it, you can come back in and do it again. Is that what I'm saying? No, that's not what I'm saying, but this is a different circumstance here. This is like a foreclosure action where you're held in default, and they foreclose on your home, they foreclose on your home, and your neighbor's home next door because you have a partner. In fact, in those cases, oftentimes the party doesn't appear. They're not served properly. They don't have the ability to hire a lawyer. They're fearful of perhaps appearing, but this is not that case. We have a person who was served, who participated, and who at some point chose not to participate. So please, do not compare this to the individual who is in the unfortunate circumstance of losing their home because maybe they weren't served. This is not, you cannot compare this case to a foreclosure. When you offer up your default judgment, you have to have basis in fact for what you're offering up. You can't just pick a number out of the hat. You can't just pick property that's not owned in a divorce setting. Okay, now we're back at you. We're back at the appellant. The appellant's burden is to present to this court evidence that establishes that the property division was improper because you supported the record with everything to suggest that this wasn't marital property. That you have not done. You have not done that, and that is your burden. You have to show us that this wasn't marital property, and you can't just say today, well, it's not in the record when he acquired this. We presume that the court acted properly. I'm not contesting the 240,000 shares. The point is that that was not held entirely by sanity himself. There's not a question of when he acquired it. It's a question that he never owned 240,000 shares. When you were in front of the judge after your 1301 and the 1401, did you argue this particular point about the amount? I did not appear before the trial. Well, whoever represented Mr. Vanity, did they? Well, how many shares did he own? The best, you know. What do you mean best? I mean, you know, if you don't know the exact amount, how could we write something? Assuming that he did own the full shares of the alpha, that was not held in the ISHRAQ partnership, he would have held 160,000. And what evidence do you have of that? It's in the record. It was in the material that was produced at that trial. It's in Israel Action. Are there income tax returns in the record? I believe there may be a few. I'm not entirely positive because I did not look for the records for that thing in particular. Well, do you know what his income is the first year of marriage? I know it's alleged that he had a low income. But this is one of those circumstances where someone has taken an income tax return and then run with it to try and imply that he was a very poor man before he got married and that he acquired all this property during the marriage and that it's all marital property. He was a man of very substantial means. He already pre-owned one of the seats. Well, you talked about this earlier that the record doesn't disclose when these were acquired. The three that you were asking about, there isn't any indication. The record does show that he had sold one share before. He owned before the marriage in order to purchase the house. Was one of the seats sold during the time of the divorce proceeding? The fourth one that you say wasn't marital property and that he owned before the marriage. Was that actually sold after the petition for dissolution of marriage had been filed? It's not my understanding that it was. It's my understanding that that share was sold during the time of the marriage. He used his assets for the house. That's my understanding of what was done with that particular share. All right, Counsel. Well, we've drawn you way past the time that we allotted you, but that's our fault and not yours. Do you want to go ahead and make some final points? And, plus, we'll hear from you again. Just one final point, and that's that we ask that the court even – I do understand the concern that the court does not want to condone a party from walking away from a judicial proceeding. But in this case, the results were far worse than anyone could have expected because the court determined that property that Sanity did not own and that the appellee did not own would be marital property. And, consequently, the split of property was completely disproportionate to what even the trial court could have expected that it was doing. Because of the extreme circumstances here, we ask the court reverse the decision of the trial court. Thank you, Your Honor. May it please the Court, my name is Keith Hunt. I represent Pamela Harnack. Mr. Hunt, is the amount that the trial court used to divide the marital assets incorrect? Not to my knowledge. Judge? I thought the CBOE filed an interpleader action and indicated that they had a certain amount of funds representing the ownership of three seats after they were demutualized, or whatever the terminology is. And they indicated that they don't even have the amount that the court divided up in the dissolution. Now, isn't that what the record shows? I have to confess that I don't know that I can speak to that or refute it reciting something else in the record. I would say that the trial judge rendered a decision based on all of the evidence that was available to him at the time and rendered a decision that was within the sound discretion of the trial court to render at that point in time. I would point out that what we have here is a situation with a litigant, Mr. Fanady, who chooses to come and go as he pleases and chooses to use the legal system when he wants to for his own benefit and then run and hide and claims that he's cowering from some mediator because he's too scared, even though he makes million-dollar decisions as a trader every day, but now suddenly somebody tells him to write a seven-figure check and he's afraid to participate. It should be noted that Mr. Fanady is in this courtroom today. He was in the courtroom on the morning that the judgment was entered and he chose to leave. And instead of going out and filing some sort of a motion to contest that, because he was served with the judgment two days after it was entered, instead he chose to spend the next eight months running off the federal court, removing decisions, removing the case, a divorce case to federal court, as if that could ever happen, then going back and filing a separate federal court action. There have been a series of five cases. There were no less than 31 pleadings filed in those cases. Were there two? Well, there's the action that was removed. Yes. And then it was immediately dismissed to a sponte by Judge Gettleman for lack of jurisdiction. They then took that up to the Seventh Circuit Court of Appeals where they were... The dismissal was affirmed. The dismissal was affirmed. Then they filed a separate action in federal court. In the first action they were ordered to show cause why they should not be sanctioned and were not. Then they filed a second action, which is the 7799 action. That was again dismissed by Judge Gettleman. And it's noteworthy that at that time he cautioned Mr. Fanady's lawyers, the same lawyers that represented Alpha and Elsa and the same one that went on to represent Mr. Fanady, that they were getting in trouble and they were pursuing this in the wrong way. And if they wanted to, they should be pursuing this in the state courts, file an appeal, go move to vacate the judgment, do something else, but the federal courts is not the appropriate place. That's when they went up to the Seventh Circuit and got sanctioned. Then, still undeterred, they decided to go back to chancery, not divorce, chancery and file yet another action suing the judge who entered the judgment and suing the lawyers on the other side and suing everybody else they could think of. Ultimately, that case gets dismissed. And it's only after they go through all these macinations and use the legal system as a tool that they want to use to try and upset, collaterally attack what was going on as well as to seek monetary damages from people who clearly were immune, that then they come back and get to April and finally now maybe we should file a motion. You direct us. Let's assume you're correct, that it was a final judgment. All right, let's assume that. Now, tell us what we're supposed to be looking at. What do we review? What factors do we look at to determine whether or not the court abused its discretion when it entered this particular judgment? So let's assume that it's a final judgment. What do we look at under 1301, abuse of discretion? What are the factors this court would look at to review? Whether the court should have allowed this or not? Well, Your Honor just asked about 1301, and I would respectfully submit that since the petition was not filed in 30 days of the final judgment, 1301 could not apply, and it would only be a 1401 case. All right. Let's answer their contention with regard to the enforcement. They contend that since it was not a final judgment that 1301 applies. But it was, because as to Mr. and Mrs. – as to the petitioner and the respondent and the divorce action, every issue had been decided. The only thing that was left was whether there was, in essence, some lien right or some superior right to a portion of – one small portion of the shares. So that was held off to the side. But as between the husband and the wife and what the husband was going to get to keep and what the wife was going to get to keep, those issues were all fully decided. There were no kids. The marriage was dissolved, and the property was divided, and maintenance was awarded, which as the court – Can you explain one thing to me just before we leave that? In paragraph 13 of the judgment for dissolution of marriage, you know, there were some corrections made at the time of entry, apparently. And it initially said that 140,000 shares were to be transferred to Pamela Harnack. And then that was crossed out, and it says 120,000 shares. And then added, it says 40,000 shares should be placed in escrow. How does that add up? What was the intent there? How do you change the 140 to 120 and then set 40 aside? Should I assume that out of the 40 that was set aside, 20 was hers and 20 was his? I believe so. Although, honestly, I was not handling the divorce. Judge Allen Masters handled this section of it up until the point in time when he went back on the bench. Actually, the briefing was all done by him. I simply came on to argue the appeal. Well, what's your position with regard to what this judgment means? Exactly what you just said. Okay. All right. Go ahead. We believe that the appropriate standard is under 1401. Now, the appellant argues that the Vincent case from the Supreme Court controls and modified the standards of abusive discretion that were traditionally applied. And they cite to this case Calvary v. Roken. But if you look at that case, that was a situation where the person who had the judgment entered against them came into court three days after they found out about the judgment. They acted with haste. They acted with diligence. They acted to move as quickly as they could to have that set aside. In this situation, we have completely the opposite. We have a litigant who did everything within his power to avoid the state court, ran all over, filed all these other cases, and then eventually, eight months later, got around to filing a motion. And when he filed that motion, he supported it with an affidavit, as he must, under 1401. But under 1401, it says that the affidavit is supposed to show that there is diligence in pursuing the matter in the trial court, diligence in vacating the judgment, and a meritorious defense. That affidavit is three sentences long, and it does none of that. It doesn't even use the words meritorious defense anywhere. It doesn't say that they have a meritorious defense in the case. That was never argued in the trial court or in the motion itself. There clearly is no finding or no attempt to excuse the lack of diligence on his part, and no attempt to justify the inaction. Counsel for Mr. Fanaty has told us that we should relax those requirements in order to achieve substantial justice. So why don't you respond to that argument? I don't believe that when the first district in the Calvary-Roca decision considered the other prior appellate court decisions that were post-Vincent and decided that there's really a two-tiered standard of review, an abuse of discretion as it relates to the diligence factors, and a separate standard of a de novo review as it relates to meritorious defense, that it ever envisioned that what we were now going to do is give everybody a free appeal, a free pass, and let's just go see if the appellate justices look at the facts differently than what we think the trial court would have done. Keep in mind, this is not an appeal on the merits of a decision that was made. This is an issue as to whether or not a judgment should have been vacated when somebody was a participant in the proceedings up until a point in time and then abandoned the ship and now wants to come back and say, I shouldn't have done that, but please give me a second chance. And that just simply isn't, I think, a step that this court should be prepared to take or a standard that it should be prepared to set. It would completely vitiate any sense of a standard of review for a 1401 and just simply say, well, we'll look at it if we can just substitute our judgment for that at the trial court. Well, let me ask you a question. Do we have a duty to correct an obvious mistake? I would suggest that if a litigant comes in a timely fashion, acts diligently, and can show where there's evidence in the record of an obvious mistake, that the court would, under an appropriate standard and appropriate circumstances, be duty-bound to look very carefully at that. Is there an obvious mistake here? I don't believe so. There's been nothing placed in the record by Mr. Fanaty, primarily due to his absence, that shows that anything that took place in the trial court was an obvious error, or was so plain that it just called out for reversal. Let me ask you this to just follow up on that. The CBOE, I think, is telling us in their brief that the trial court has told them to give more shares than they have. Is that the case? Am I reading that right? I don't believe so, Judge. I think the situation is, as an interpleader, they're saying, look, we have what we have. You know, it can be divided up. It can go through what was held in ESCO and... Well, it seems like the interpleader action suggests that the CBOE is holding 120,000 shares, and the judgment reflects, I think Justice Palmer pointed out earlier, that there was an indication of 140,000 shares, but that was stricken, and 120,000 shares was placed into the final judgment order, which apparently does match up with the interpleader action, at least from what I'm reading. So I don't know that there's any discrepancy. I don't believe that there is. I mean, if somebody comes into court with a typewritten order, and there's a typographical error or something, or any other kind of error there, prior to the time that judgment is entered, the parties in the court correct it so that it adequately reflects the facts, I think that's exactly what they're supposed to do. I would simply conclude by indicating that, in this situation, we have a 2008 divorce filing. We've had five separate suits that Mr. Fanady has been part of. We've had... And I think enough is enough. It's time to hold Mr. Fanady accountable for his consummation disregard for the judicial process, his own blatant disregard for the judgments of the court, and the consequences of his own action or inaction for the fact that he chose for eight months to go fiddle around in the federal courts with cases that even a first-year law student would know don't belong there. Let me just follow up. In their brief, in the CBOE's brief, they say that CBOE holdings and computer share learned that paragraph 12 of the divorce judgment purported to award 140,000 shares to Harnack when Elta and Fanmayer combined held only 120,000 shares at computer share. Paragraph 13 of the divorce judgment also ordered CBOE to place 40,000 shares of stock that were currently registered to Elta in an escrow account pending resolution of this very law's claim. As a result of the competing claims to the stock and dividends and the fact that it was impossible for CBOE holdings to comply with the terms of the divorce judgment because it ordered CBOE holdings to distribute or escrow more shares than it held, they filed an interference. So my understanding is CBOE is saying we can't comply because we don't have as many shares as the judge awarded. Am I reading that wrong? Well, if that's the position they're taking, that's fine. It seems to me that's an issue that after this court affirms, as we think it should, they certainly can go back in terms of a post-judgment matter and sort that out with the trial judge. If they're claiming that they no longer have what they once were supposed to have had or what have you. When was the interpleader action filed? Was it filed before the final judgment of the solution? It was, and then the matters were consolidated. Okay, so obviously it was there before the judgment. So are you telling us that we should send it back for an evidentiary hearing to determine the amount of the shares? No, I'm saying that that's really not an issue as it relates to the appeal that was filed by Mr. Fanning. That's something that relates to a third-party folder of some asset that they can pursue in an appropriate form. You think that could be lost on an interpleader action? Exactly. I don't think that has anything to do with whether or not the judgment of dissolution, which is really the only issue on appeal, should be upheld. One final question. Counsel for Mr. Fanning is arguing that she believes the court's intention was to give Ms. Harnack 50% of the marital estate, not what appears to be now 87.5%. And she bases that on the initial error in the court's finding, that it believed there were more shares available than actually were available. So if that's the case, what is your response to that? I guess I have two. One, it would have been very helpful if Mr. Fannity was there to clarify that at the time. And number two, the only reason that that happened was because Fannity had been playing games with the assets all along and had been transferring things from one partnership to another, creating new partnerships to try and basically secrete those assets from the court or to divest himself of certain assets so that at the time somebody would enter a judgment of dissolution, they would see a different number or a different picture. I think at this juncture, though, that all of that is really self-inflicted injury. Is there any indication, by the way, that the trial judge indicated that he was intending on giving a 50-50 split? No. I mean, you know, one of the things that we're an equitable distribution state, and one of the things that can be taken into account when deciding this is what's the relative earning power of the parties? Isn't Mr. Fannity a multifold over greater earning power than your client? And another factor is in terms of a history of not complying with the court's orders with regard to maintenance, can't the court also give a disparate amount of the assets to the person who never got her maintenance because it doesn't look like he's ever going to pay maintenance? And he hasn't to this day, Jeff. We agree with each of those points. I mean, the fact of the matter is Mr. Fannity got what he deserved in the divorce. All right. Why don't you go ahead and wrap yourself up? I think I have other than to say we respectfully request that the judgment of the trial court be affirmed. Thank you. Thank you. Your Honor, I think that I want to address during the course of what I hope will be a brief presentation three issues. The issue of finality. The issue raised by Justice Palmer, and it had two parts, how does this add up, and then the issue with respect to the CBO's allegations that they're being asked to hold back or distribute more stock than they have. To do that, I think I have to do a very brief review of the chronology. Mr. Israel and the parties, Mr. Israeloff invested not a small amount of money, a million three-plus, to join a partnership known as ISRAFAN. I think it's pretty clear where the name came from, Israeloff and Fannity. But the other partner was not Mr. Fannity. The other partner was an entity known as Alpha Industries, Inc. I'll refer to that as Alpha. Well, it's not clear from the brief, but I want to know, when did this partnership begin? That was exactly my next sentence, Judge. All right. It was January 26, 2010. It's in Appendix 64. Okay. So this partnership arose while this case was pending, the dissolution was pending. Absolutely, Judge. Okay. And what about that other partnership? Do you know anything about when that was? I don't, Judge. I don't. Okay. But as far as your client goes, he entered into this partnership agreement with the Alpha Corporation. No? Yes. All right. While this dissolution was pending. Yes, Your Honor. Okay. And what was the purpose of that? What was the purpose? The purpose of which, Judge? I'm sorry. The purpose of entering into this partnership. The purpose of the partnership was to own a seat at the CBOE. They purchased that seat for $2 million. The reason that the seat was held in... Wait a minute. Didn't Alpha already own that seat and he was entering into it? No. The partnership agreement makes it clear that they both contributed $1.3 million. Okay. So then this is a seat that actually was purchased during the marriage because the dissolution had not taken place... I believe that, Judge. Yes. All right. And isn't there a presumption that those assets are acquired during the marriage are presumed to be marital assets? Yes, Your Honor. All right. And before the divorce decree, and I'm going to jump ahead with the chronology because I don't want anybody confused. Okay. Before the dissolution, before the dissolution, the partner of Mr. Israeloff's, Alpha, entered into a settlement agreement with him found at page 99 of this, before the dissolution was entered, that said this, I, Alpha, have gotten my one-half distribution. Now, it also could have said, without Mr. Israeloff's knowledge or position, but what was said before a dissolution decree was entered was, I, Alpha, got my half, and the next half, the next, it's 80,000 shares. It's 80,000, I'm sorry, it's 80,000 shares total. Yes. 40,000, Alpha had already received. The other 40,000, and it says so in the settlement agreement, I'm going to quote from that in a moment, when it comes in, because they had been frozen in $40,000 tranches, not my favorite word, but their word, and that is that the second $40,000, Alpha says, before a divorce decree, that goes to Mr. Israeloff. So, whether or not this was or was not marital property, if it was, the distribution to Alpha was a marital property distribution, and they're done. Now, let me continue, and I think the Court's gotten ahead to my answer, but there's some fill-in-the-blank chronology steps that I want to take. Excuse me. On June 14, 2010, about six months after the agreement, the first that they convert the seat into 80,000 shares. Shortly after that, another six months later, 40,000 of the 80,000 shares become unfrozen in December of 2010. The name, the holder, the placeholder of that stock has to be Alpha, because the CBOE does not allow partnerships to hold seats or stock. It has to be an entity, a corporation. So, Alpha tells, in its name, the partnership assets, which were the 80,000 shares. And the unfrozen term you're using, that wasn't the result of any injunction or temporary restraining order that had been? Absolutely not, Judge. Not that we had any notice of, not anything. There were some injunctions in place. They come later, Judge. All right. And again, you're just two steps ahead. No, it's just the freeze period after the distribution. Absolutely. Judge, there's a freeze period of six months, December, 40 get unfrozen. Alpha takes them. Without Missouri law's permission, without its consent, but they take them. We then file a lawsuit in February of 2011 and say, stop. And we're the ones, Judge, that get the injunctions. We're the ones that get the injunctions that say, freeze everything, stop everything. It moves from a TRO to a preliminary. Those are the injunctions that are in place now. But now, critically, and I think this goes to the issue of finality, and it will develop, I think, the answer to how does this add up. Before the divorce decree, before the judgment is entered, we enter into a settlement agreement with Alpha. Alpha is now run by a new general manager because Mr. Fanaty has resigned. That settlement agreement says, critically, all of the facts that I've just told you, and then it goes on to say, whereas Alpha, and I'm quoting from the abstract at 100, whereas Alpha has received its pro-rata portion of the shares, 40,000 shares, prior to December 23, 2010, whereas Israel law's pro-rata portion of the shares, 40,000 shares, remains due and owing to Israel law. And then the agreement goes on to say, when the injunctions get lifted, when you have access to the 40,000 shares, when you can get them from the CBOA, that, Mr. Israel law, goes to you. That's about two months before the divorce decree, so then the divorce decree gets entered. I think that the 140 mistake, I don't know how it was made, the 120, does add up. I mean, just doing the math, you ask how it added up. If you take, at that point, there was an assumption, I believe, the record indicates, that there were three seats that had been available, three seats converted $80,000 each to 240,000 shares. One half of 240,000 shares is 120. Now, we were there, and we objected when the judge said, I'm going to give 120,000 shares to Mrs. Vanity Namastarnik. And we said, wait a minute, Your Honor, you're assuming he's got all that. He doesn't have all that. It's not even half his. He already got the distribution of his half of our seat of our shares, and the judge did a perfectly sensible thing and said, I'm going to set aside those $40,000 shares, those 40 shares, and I would submit that that's 40,000 shares of the 120 that are being held at CBOE. So that's how it adds up to 120. So then the court didn't really distribute 87% to Arnie. Not based on what was before the judge. The judge thought, Your Honor, there were three chairs converted to 240, three chairs, 240 shares, cut it in half to 120, and we said, wait a minute, they'd already gotten their 40 of our share. And the judge said, we'll wait on that. We'll escrow that. And there may indeed be, I don't think appropriately, I don't think it's a substantive claim, but if the ex-wife wants to come and claim somehow that she's entitled to some of Mr. Israelov's 40,000 shares, she can do that. And that goes to the issue of finality. And respectfully, something that Vanity did not address in its reply brief because they couldn't enmatch this. I just want to clarify. It's your belief that the court set aside 40,000 of the 120,000? Yes. To make this finality point. Yes. We do have a line of cases that talk about the fact that divorce courts can set aside what would otherwise be ancillary issues and still have finality. I'm not going to repeat that line of cases. That's well developed in our brief. What I do think needs to be emphasized in oral argument because it was not addressed in the reply brief is this. Mr. Vanity has no claim to any portion of the $40,000, 40,000 shares. As far as he is concerned, all of his property interests and claims have been resolved in that divorce judgment. Part of it is because of your settlement agreement. Because of my settlement agreement, Judge, I think apart from the settlement agreement, maybe they say something. But once we have a settlement agreement where alpha, the Free Israel Law's only partner, says we relinquish all claims to this $40,000, Mr. Vanity cannot articulate what property interest he has that hasn't been resolved. And that was the point that I wanted to make on finality. I think I've addressed, Your Honors, the three points I wanted to, which was finality, how does it add up, and the CBOE certainly may have thought before the $140,000 was amended to $120,000, and before I think there's been clarity that of the $120,000 they hold, that includes the $40,000 that they're holding in escrow pursuant to Mr. Israeloff's claim. So if we're going to write something, what do you want us to write in reference to that? I think that as simple, Your Honor, as, and I don't mean to be glib on that, it's just affirmed. I think that the decree is clear. I think that the $120,000 correction makes it clear. I think that if, I just have never thought that there was any problem once the $140,000 is corrected to $120,000. It was clear what the court meant to do, and it set aside our $40,000, and we will have or not have a disagreement with the ex-Mrs. Vanity about her claimed interest in that $40,000 shares, and that withstanding the fact that during their marriage, Alpha admits that it received its distribution of half the partnership. So I think this is one as simple as affirmed. And by the way, if you go back to math again, which was never my strong point, but if you go back to math again and if you divide that number in half, and then you take the one half and take the $40,000 out of that and give it to your client, she's actually getting less than 50%, which is not necessarily wrong, because as counsel argued, this is short-term marriage. Your Honor, I don't pretend to know anything about divorce, but I will say this. I think the real issue is not what she got relative to what was there at that time, as much as it was that the overlooking the fact that during the marriage, Mr. Vanity, while married, got the value of those $40,000 shares. So what she got at the time of the divorce of what he owned and had not been distributed to him, I think you take that $40,000 shares out and then you look at what's there. Because Alpha's right. Mr. Vanity had two alternatives, to admit he unlawfully took the money or he just took his half without permission. He chose the latter. And so when you look at the pie that was being cut up at the divorce court, I think it excludes, because Alpha says it should, the $40,000 shares. What about their claim that there was only $160,000? $160,000. I don't know that that was of record, Your Honor, and that's my difficulty with the case. I think that as I read what was before the divorce judge and the way we've interpreted it, it was three seats, 240 shares. And that's certainly the court's point. That fact is certainly not in the record as to my recollection.  Thank you, counsel. Yes, sir. Go ahead. My name is Paul Riemel. I work at CBOE. I have a claim to speak today. I was in this case when the interpreter saw my report. Counsel. Your name again, please. Paul Riemel on behalf of CBOE Holdings and Computer Shareholder Services. And I just step forward to correct one misstatement that I believe Mr. Hunt made where he agreed with Justice McBride and said that the interpreter was filed after or was filed before the judgment was entered. As the interpreter complaint makes clear, the divorce judgment was entered, and at that point I was contacted. The judgment was entered before the interpreter? Correct. Now, in your interpreter action, is it correct that the CBOE held 120,000 shares or not? We currently hold 120,000 shares, which we have continued to hold pursuant to all the injunctions. We're also holding the accumulating dividends on those shares. Yes. So there's no error whatsoever in the amount that you're holding that is 120,000. We currently hold 120,000 shares. 80,000 shares are in the name of Alpha, and 40,000 shares are in the name of Fanmare. And those are the shares that are the subject of our interpreter action. Originally, each of those entities combined held 240,000 shares. 120,000 shares were transferred out in early 2011. When was the Fanmare seat purchased? I don't know when the seats were purchased, Your Honor. We just know that the stock was issued pursuant to CBOE's demutualization. 120,000 shares were transferred out in 2011? Correct, Your Honor. In paragraphs 16 and 17 of our interpreter complaint, we go through the chronology. That is, in the record, the sites are 2459. So 120,000 shares were already distributed? Were transferred out. As Your Honor pointed out, Justice Palmer, there were restricted stock issues. When the first tranche of restrictions was lifted, we received instructions from both Alpha and Fanmare to transfer those shares out. When they're transferred from our transfer agent, we don't have control over them anymore. So what happened to them, where they are today, we have no knowledge. But at one point, there were 240,000 shares that were going to be distributed, based on the ownership of three seats, correct? Distributed in the divorce statute or distributed by CBOE? By CBOE. Correct. Each share as part of CBOE's demutualization received 80,000 shares. So 120,000 shares went out the door while the divorce was pending. And, Your Honor, we don't know where those shares went. All right. But they went out. That is correct. Okay. Counsel, we appreciate your assistance here. Thank you very much. Laveau? I'd like to address the question of the 240,000 shares of CBOE stock, because I believe there's some misunderstanding here. While there were 240,000 shares, they're not held entirely by Fanmare itself or even by a company in which Fanmare is the sole owner. Fanmare is a partnership. Michelle Marmon is a partner in that, has a 50% interest rate. When did they purchase that fee? Fanmare. I'm unaware of when it was purchased, and I do not believe that the purchase date is in the record. You believe it is? I do not believe that it says in the record when Fanmare purchased. And gaps and absences in the record, you know, go against the appellate. Yes. But I don't, with the greatest respect, the purchase of the seat does not impact the decision here, because Fanmare, Michelle Marmon contributed 50% of the assets to purchase the seat, as did her partner. So in any event, we're talking about, it's not a situation where vanity purchase paid entirely for a seat and gave part of it to 120,000 shares that are gone. They were taken out. Right. Only a portion of that would be the corporation that Michelle Marmon is part of. Marmon? Marmon. All right. Yeah. So can you give us a little math here? How much of the 120,000 shares did Mr. Vanity get when it was disbursed? It doesn't say. There's no indication. So it could be 120,000 for all we know. The absence of the record and the omissions, again, work against the appellate. Can we at least? I'm sorry. I'm sorry. What I'm saying is that there is not 240,000 shares that were marital assets. Well, can we assume that he at least got half of that? You're telling me that Michelle bought 50% of that, but the other half of Fanmare is Fan. So should we assume that when that 120,000 shares went out the door, that at least 60 went to your client? The 240,000 shares represent 80,000 shares. You're not answering my question. My question is, we know the CBOE just told us 120,000 shares went out the door during this marriage. You're saying that Fanmare got this money. Can we assume that 50% went to your client? No, I'm not saying Fanmare got this money. I apologize, Your Honor. What I'm trying to say is there were not 240,000 shares to begin with that were marital assets. Of those three seats, at least two-halves of the seats were owned by partners. If those assets were held by either party while a dissolution action is pending, are you suggesting that this Court, that one of those parties has the right to self-help, so to speak, divide the assets before the Court? No. That's the opportunity? No. I just want to make sure. No, that's not what I'm saying. You're saying that there were three seats that were valued at 240,000 shares, but that really none of them were part of the marital estate. No, I'm saying two-halves are clearly not part of the marital estate because they were owned by other parties. What do you mean two-halves? What's two-halves? Do you mean half or two shares? Two-halves. It would only be a half of one and a half of another. Right. So two one-halves. So 40,000 and 40,000. I'm just trying to clarify that there would never have been 240,000 shares that could have even been considered marital property. Well, that's not really for you to decide. That's really something that the trial court decides. When it has to look at it, when were they purchased? Why were they purchased in 2010 when a dissolution action was pending? We don't even know now.  But we do know that at some point this company, Alpha, was the owner of at least three different seats. And it's not for the lawyers or the individuals to decide when a dissolution action is pending whether those are marital assets or not. The only forum and the only arbiter that can decide whether those are marital assets is the trial judge hearing the case. That is clearly the law in the state of Illinois. I agree, Your Honor, but as has been presented here, for example, with Ishram, 40,000 of those shares were Israel loss, and he purchased those shares in conjunction with Alpha. Both contributed 50% of the purchase. And those have been set aside? Well, they have been set aside. But what's not clear clearly indicates that of the 80,000, 40,000 belong to. That's what was agreed to? But what is the judgment here to not finally resolve those matters? Because, first of all, there's an Israel loss. Counsel has taken the position that he believes those 40,000 shares should come from the 120 that was awarded Harnack. But the order doesn't provide that. It doesn't specify that those 40,000 shares are supposed to come from that 120. Well, the enterprise reaction is still pending. Right. And it will be resolved when and if that gets done. That's not something that's before us. But it doesn't impact the finality of this judgment because it did not resolve all of the issues. No, the 40,000 has been resolved against your client because he entered into a settlement agreement in which he declared that 40,000 had already been received by him and the other 40,000 was left to be distributed to Mr. Israeloff or his corporation. That's been resolved. But those 40,000 shares that are being held, part of the reason they were held was because other parties are contending that they should get, including the trial of Harnack, and then she should get those as did Attorneys Pratt and Levin. So this issue was not resolved by virtue of those. It was at least resolved as to your client. You're saying a bunch of people are fighting for those 40,000 shares. Your client's not. But it depends on what other, the order is worded in such a way that what's remaining goes to him. So if 40,000 really has nothing to do with him at all, so how is this judgment? For example, if the 40,000 comes from Harnack's 120,000 shares, that's different as the court rules that the 40,000 comes out of the other shares than, of course, these. But there are no other shares. There's only 120,000 shares right now that the CBOE gives. Yes. Which means that... So there are no other shares to distribute. No matter how you slice this pie, 120,000 has been gone for some time. But there's only 120,000 that the court can distribute. And the order of that judge who distributed them had only 120,000. There's nothing more. We can't create any more shares than what there is. And the decree actually disposes of the exact amount that the CBOE is holding. Aren't you saying that two-half shares was not marital property? Yes. So that makes it 160,000. That's what you're saying. And, of course, what's been... Of course, but the trial judge found different. The trial judge found 180,000 shares were marital property. And actually, an earlier portion of the decree declares that there's 320,000 shares that were marital property, which goes to our contention that there is just a serious fundamental error here. Well, that was because of the other cease, wasn't it? The fourth cease. Isn't that how the 320 originally came about? It doesn't. There's nothing in the record which shows... But if you had the numbers, you know, 80,000 times four, you'd come up with 320,000. That's what... From reasons that it's not specified in the record. But eventually, the court was working with 240,000, and it appears that she wanted to give half to Harnack, and that's exactly what she did. So half is not 87.5%. Except there was half. She actually set aside the 40,000, as Mr. Dahl is suggesting. She actually got less than half. But here's what I want to ask you, and then I'm done with my question. What does a court do when a maintenance order is completely ignored when it's finalizing a judgment for dissolution? What does a court do when it's presented with a party who has ignored all the proceedings, but at the end of the day has also ignored several hundreds of thousands of dollars in maintenance awards? What does the court do then in fashioning that judgment? In this case, what the court did was it added for future maintenance, it also added the back maintenance that had not been paid. So it ordered $365,000 in maintenance on top of the split of the shares, on top of awarding for the house. I mean, the shares are not the only thing that she was awarded. She was awarded a substantial other thing. In addition, as punitive, it also ordered $200,000 in attorney's fees. So it did address these issues in this judgment dissolution. But to make it very simple, you're saying that there was 160,000 shares that was marital property, correct? That's the maximum. Okay. And therefore, she should get 80,000 shares. I'm not saying she should get 80,000 shares. Well, I'm just saying by using that arithmetic, if she's going to get half. I'm not even contending that the half is fair given the shares. I'm not talking about fair, but if a judge wanted to give 50%, it would be 80,000 shares. Yes, if the judge was giving 50%, it would be 80,000 shares. So she got 120, but 40 is going to go to somebody else, so she gets 80. That's all she's going to get is 80. That's what's been contended here, but that's not what the dissolution order actually reads. It doesn't say those 40,000 shares that are set aside are set aside from the 120,000 that were ordered. Well, if you take all the orders together, that's what it says. Can we gain that vote from the record of the proceedings on that thing, that that's what was intended to be done?  Yes, there's a report of proceedings, but it doesn't specify where the 40,000 shares are supposed to come from, as I recall. And really, the only thing we have here is your suggestion that these were not marital assets. There's nothing in the record to support the position of that. Well, obviously, the issue from lawsuit, Israel lawsuit, supports this position and also in support of the motion to set aside. They did present information regarding marriage. To follow up on what Justice Gordon just said, I mean, if we took that $40,000 out of the 120 that the CPOE has right now and we put that aside for the interplea reaction, she gets $80,000. You say there's 160. She gets 80, he gets 80. What's the problem? The problem will be that, in the greatest respect, that's not what the order actually says. Well, what if we do that? What if that's our decision? Is there something wrong with that? They each get 80? He's a multimillionaire. He makes money like crazy. I believe that the more appropriate thing to do would be for a man that's been asked to try for tax discretion and decide what's there in this instance, because this is not a final decision. It should have been decided under 213.01. So it's more appropriate for the trial judge to address that, and then the factual contentions that are issued and have been questioned here can be brought before the trial court. Yeah, but if we find that his conduct is such that we can't give him another fight at the apple, but we have a duty always to correct an obvious error. There doesn't appear to be an obvious error here. If she's only going to get 80,000 shares, then it's not obvious anymore. Then it's a question of fact. And since his conduct was such where he walked away, we can't give him two bites of an apple. I don't think, though, you can ignore the other portions of the judgment. The paragraph immediately before the fair repertory. Well, if we clarify it, then we've done our job, evidently. And then also the earlier portion of the order rules that there are 320,000 shares that are marital assets. It actually declares that there are 350,000 shares. Yeah, but the bottom line is that she gets 80,000 shares. And if that's the bottom line, then that should be the bottom line. I believe the more appropriate position is to remand it so the trial court, unless the trial court addresses factual issues and exercises discretion, which in this case never has. It never exercises discretion because it was deprived the opportunity of having a full and complete evidentiary hearing because your client walked away. And so if we can find a way to fashion a remedy here so that it doesn't have to go back to the trial court, so more judicial resources aren't wasted, that may be the better way to go. Thank you, counsel. Thank you, Aaron. Court is adjourned.